UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas Bruce VEST, also known as T.
Bruce Vest, doing business as Doctors
Clinic, Defendant–Appellant.

No. 95–3671.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1996.

Decided June 25, 1997.

Thomas M. Daly (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Don W. Weber (argued), Collinsville, IL, for Defendant–Appellant.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Dr. Thomas Bruce Vest is, by all accounts, not your ordinary medical doctor. Vest is both an internist and a radiologist—an unusual combination in the field of medicine. Vest claims this combination allowed him to practice a new method of preventive medicine at his $10 million, state-of-the-art Doctors Clinic in Alton, Illinois. The United States, however, claims that Vest used his position as an internist to order unnecessary medical tests conducted at his own clinic, thereby bilking patients, private insurance companies, and the government out of thousands of dollars. A jury convicted Vest on 33 counts of mail fraud under 18 U.S.C. § 1341. On appeal, Vest asserts numerous trial errors. We find that none of his arguments

justify reversal, and we therefore affirm the judgment of the District Court.

## I. HISTORY

Dr. Vest began conceptualizing his Doctors Clinic back in 1977. Vest envisioned up to 12 doctors working as limited partners at a state-of-the-art diagnostic and treatment center. The clinic was completed in 1985, but Vest was unsuccessful in getting other doctors to invest in the partnership. Vest therefore had only his own primary-care patients and patients referred by outside doctors to finance the clinic's considerable operating expenses. With its MR scanner, CT scanner, two surgical suites, emergency room, medical laboratory, and other sophisticated diagnostic equipment, the clinic had operating expenses ranging between $150,000 and $250,000 per month. Vest advertised heavily to generate walk-in patients, but by 1991, Vest was forced to declare bankruptcy.

In 1993, a federal grand jury indicted Vest on numerous counts of mail fraud. The true bill alleged that Vest had engaged in a scheme to defraud by falsifying medical records and ordering unnecessary medical procedures since 1985. Each count in the indictment referred to a particular patient whom Vest had treated.

At trial, the Government offered three general categories of evidence against Vest. First, the Government offered economic evidence suggesting that one could not legitimately run a clinic like Vest's without more referring doctors. A radiologist and professor of medical economics at Washington University in St. Louis, for example, testified that Vest never had enough referring physicians to make the clinic economically viable. The expert also testified that he had never known another radiologist to practice primary care and make self-referrals for testing. An insurance company employee also testified that Vest, when questioned about excessive billing, angrily responded, "You're damn right I'm going to use this equipment. It's expensive and I have to pay for it somehow."

Second, the Government presented 36 patients who testified that during their visits to the Doctors Clinic, they did not report many of the symptoms and past conditions that Vest recorded on their medical records. On cross-examination, defense counsel used the patients' pre-visit and post-visit medical records to impeach the patients' recollections. If, for example, a patient denied that she reported dizziness to Vest, defense counsel was allowed to cross-examine the witness with medical records showing that the patient reported dizziness either before or after visiting the Doctors Clinic.

Third, the Government presented four medical doctors who testified that many of the tests Vest ordered were medically unnecessary. The first expert was a board-certified radiologist who testified regarding all 36 patients and the procedures Vest performed on them. The other three experts—who were board-certified in surgery and quality assurance utilization review, internal medicine, and rheumatology and internal medicine, respectively—each testified regarding approximately one-third of the patients. The jury therefore heard expert testimony on each count from two Government medical experts. Unlike the cross-examination of the patients, the District Court prohibited Vest from using the patients' pre-visit and post-visit medical records during the cross-examination of the Government experts. Two of the Government experts also testified that Vest's testing did not follow the normal "sequencing" of medical tests, which doctors use to prevent unnecessary testing.

Vest offered three medical experts of his own, including his son who is an orthopedic surgeon and a cousin who is a diagnostic radiologist. The third expert was a board-certified psychiatrist and neurologist. These experts testified that the tests Vest ordered were medically necessary based on Vest's records and that, on most occasions, the tests were necessary even without the allegedly-false symptoms that Vest recorded. Vest himself also testified and denied that he ordered any inappropriate tests. Vest also stated that he accurately recorded the patients' symptoms, thus rebutting the patients' contrary assertions.

After a 55-day trial, a jury convicted Vest on 34 counts and acquitted him on two

counts. The District Court later granted Vest's motion for judgment of acquittal on one of the counts. The District Court sentenced Vest to two years in prison and ordered him to pay fines and restitution totaling over $65,000.

## II. ANALYSIS

### A. Limitation on Defendant's Use of Patient Medical Records

■ Vest first contends that the District Court abused its discretion when it limited the use of the patients' pre-visit and post-visit medical records. Although the District Court allowed Vest to cross-examine the patients with their pre-visit and post-visit medical records, the District Court did not allow Vest to cross-examine the Government's medical experts with the records. Vest argues that such evidence was vital to showing his innocence.

Whether this evidence was relevant and should have been admitted depends, of course, on what facts are "of consequence to the determination of the action." *See* Fed. R.Evid. 401. To prove its counts of mail fraud, the Government had to prove that Vest had 1) devised or intended to devise a "scheme or artifice to defraud," and 2) placed something in the mails "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1341. Crucial to the Government's case, therefore, was proving that Vest intended to defraud when he ordered the tests and submitted the bills through the mail. *See United States v. Feldman*, 711 F.2d 758, 765 (7th Cir.1983) ("An essential element of a mail or wire fraud violation is specific intent to defraud.").

How might one prove such intent? Two routes are readily apparent, either of which would be probative of fraudulent intent. First, one could show that Vest made false entries on the patients' medical records. If Vest truly did falsify these reports, the falsification would be strong evidence of an intent to defraud. The inference, moreover, would be strengthened if the Government could show that *without* the false medical symptoms, the tests that Vest ordered would have been unnecessary.

The second avenue one could pursue is to show that the medical tests were unnecessary even if Vest's medical records were perfectly accurate. In other words, one might prove fraudulent intent without reference to whether Vest lied on the medical records. An expert might testify, for example, that even assuming Vest was confronted with a patient having the symptoms he recorded, he never should have ordered the tests. If an unquestionably-competent doctor orders tests that his own records indicate were beyond all bounds of normal medical practice, one can reasonably infer that the doctor had a fraudulent intent.

In the indictment, the Government alleged both the falsification of records and the ordering of unnecessary tests, and the Government pursued both avenues of proof at trial. First, to prove that Vest falsified the records, the Government presented 36 patients who testified that when they visited Vest's clinic, they did not suffer from the maladies that Vest recorded. The Government also asked its medical experts a series of hypothetical questions based on the assumption that Vest's records were *false*. The experts testified that many of the tests Vest ordered would have been inappropriate for patients who did not have the allegedly false symptoms. During cross-examination of the patients, the District Court allowed Vest to use the pre-visit and post-visit medical records to suggest that the patients might have forgotten what symptoms they reported to Vest. The District Court also allowed both the Government and Vest to submit summary charts of the pre-visit and post-visit records to the jury. Vest wanted to use the records to cross-examine the Government experts as well to show that the tests were medically justified. The District Court, however, prohibited the cross-examination of the experts with the records and instructed the jury that the records were admissible only for impeachment of the patients.

Second, to prove that Vest ordered unnecessary tests, the Government asked its experts a *second* series of hypotheticals based on the assumption that Vest's records were

*true.*[1] The experts testified that even assuming that Vest was honest with the records, many of the tests he ordered were still medically unnecessary. The District Court again did not allow Vest to cross-examine the experts using either the pre-visit or post-visit records.

The District Court's limitation on the use of the pre-visit and post-visit records was not an abuse of discretion because those records were irrelevant. The ultimate issue that the Government had to prove was fraudulent intent. To prove that intent, the Government asked experts to assume certain sets of facts and then give their expert opinions regarding the medical implications of those facts. In particular, the Government asked the doctors what an honest, competent doctor would have done when confronted with a patient with the assumed symptoms. Vest was entitled to attack the experts' conclusions by challenging either part of the hypotheticals: the factual assumptions or the medical implications. The pre-visit and post-visit records were irrelevant, however, because they challenged neither. When diagnosing the patients, Vest had the pre-visit records of only one patient, and Vest obviously had none of the patients' post-visit records.[2] Introducing the records, therefore, would not have attacked the hypotheticals' assumptions as being inaccurate. If Vest did not have the records, assuming that he did would not make the hypotheticals any more realistic and thus improve the experts' conclusions. If in hindsight it turns out that, considering the patients' pre-visit and post-visit records, the tests Vest ordered *were* medically necessary, that is merely a fortuitous coincidence. It does not rebut the inference that Vest had a fraudulent intent when he ordered the tests with the data he had. As we stated in a strikingly similar case, the defendant's "intent to defraud does not turn on whether some of the clients 'actually' needed such treatment; it is enough that the defendant thought at the

time that they did not or that he made the decision ... without regard to whether there was a need therefor." *United States v. Reicin,* 497 F.2d 563, 571 (7th Cir.1974); *see also United States v. Bucey,* 876 F.2d 1297, 1311 (7th Cir.1989) ("[T]he ultimate success of the fraud and the actual defrauding of a victim are not necessary prerequisites to a successful mail fraud prosecution."). The pre-visit and post-visit records were therefore irrelevant and properly excluded by the District Court.

The best argument for Vest is one that he mentions in his brief but that we develop more fully here. Perhaps the premises of the hypotheticals were flawed because the records Vest made do not fully reflect the information Vest had before him. Vest's first-hand observation of the patients, in other words, might have revealed information that he did not report on the medical records but that would have justified the medical procedures. The experts' conclusions would be of little value, therefore, because the facts they assumed were not a complete reconstruction of the data Vest had in front of him. And the inference that Vest had more data available would be strengthened if he could show that his decisions to order the tests were, in hindsight, correct.

We are not persuaded by this argument because Vest could easily have made some notation of his inchoate hunches on the medical records. We are wary of the claim that a doctor, upon examining a patient, would order batteries of tests for reasons so inarticulable that they are unrecordable on patient records. Doctors are not shamans, and even the most intuitive diagnostician would have some medical theory on which to base his recommendation. In today's cost-conscious and litigious world, doctors' actions are routinely reviewed based on the medical records they keep. Indeed, one of the Government's experts suggested that doctors should expect

---

**1.** For some unknown reason, the Government did not ask this second series of hypotheticals of its first expert witness who, as noted above, testified regarding all 36 patients in the indictment. The Government did ask both series of hypotheticals to its other three experts, who each testified regarding approximately one-third of the patients. For this second type of hypothetical, therefore, the jury heard testimony from one Government expert on each count.

**2.** Because Vest did have the pre-visit records for one patient, the District Court allowed Vest to use the records when cross-examining the experts regarding that patient.

to be judged on those records. After admitting on cross-examination that diagnosing doctors' first-hand impressions put them in the best position to decide what tests are necessary, the expert explained that the doctors should nevertheless "document it in the medical records so the rest of us will know that as well."

Even if one gives some credence to Vest's argument, we still do not think it is strong enough to make the District Court's exclusion of the evidence an abuse of discretion. The District Court had to balance the records' probative value versus their unfair prejudicial effect. *See* Fed.R.Evid. 403. Allowing Vest to cross-examine the experts with the records would have risked confusing the jury by giving Vest the benefit of coincidental, hindsight justifications for the medical tests. Combined with the weak probative value of the records, this risk of juror confusion placed the District Court's decision "within the range of options from which one could expect a reasonable trial judge to select," *United States v. Koen,* 982 F.2d 1101, 1114 (7th Cir.1992), and therefore also within the bounds of the court's discretion.

### B. Buttressing of Patient Credibility with Expert Testimony

■ Vest next argues that the District Court improperly allowed one of the Government experts to bolster the patients' credibility when the expert testified regarding the hypothetical questions discussed above. Vest points to 31 instances where the Government asked the expert whether, based on Vest's medical records and patients' prior statements to the FBI, the patients were telling the truth about Vest recording false symptoms. These questions, according to Vest, did not merely ask the expert what medical procedures would be necessary assuming that patient X had symptom Y. Instead, these questions also asked the expert to testify, based on the expert's review of the patient's medical records and the patient's statement to the FBI, whether patient X *really had* symptom Y. To quote but one example from the trial:

Q: Did you in your review of Dr. Vest's file and the statements made by the patient, confirm that this, in fact, was why the patient came and what she had and what she didn't have?

A: Yes, that is correct.

(Trial Tr. at 4860).

The Government, in other words, asked the expert whether, after review of the prior statements and other records, the patient actually had the symptoms Vest recorded. Experts may rely on evidence that is otherwise inadmissible if the evidence is "of a type reasonably relied upon by experts in the particular field in forming the opinion or inferences upon the subject." Fed.R.Evid. 703. The subject of these government questions, however, was the credibility of the patients—something not within an expert's area of special competence. With only Vest's records and the patients' statements to the FBI as evidence, the expert was in no better position than a lay person to say whether the patient testified truthfully. "Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." *United States v. Benson,* 941 F.2d 598, 604 (7th Cir.1991).

■ Vest, however, did not object to these 31 improper questions until after all of them were asked and answered. His failure to make a specific and timely objection in order to give the District Court the opportunity to address the error means that we review only for plain error under Federal Rule of Criminal Procedure 52(b). *See United States v. Johnson,* 26 F.3d 669, 677–78 (7th Cir.1994). The error here is plain, in the sense of being "clear" or "obvious." *See United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). Before we can correct such an error, however, Vest must show that it 1) affected his substantial rights (*e.g.,* by altering the outcome of the trial) and 2) seriously affected the fairness, integrity or public reputation of the judicial proceedings. *See id.* at 734–36, 113 S.Ct. at 1777–78.

Vest has failed to meet this burden for a number of reasons. First, before the expert even testified, the District Court told the

jury that it was not·"obligated to accept the expert's opinion as to the facts." Second, after Vest finally made a specific objection, the District Court warned the jury that experts "cannot vouch for any other witness." Third, Vest does not assert that the Government asked such improper questions of its later expert witnesses. We must, of course, "presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Id.* at 740, 113 S.Ct. at 1780 (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985)). The cautionary warnings to the jury and the cessation of improper questioning after the first expert witness lead us to conclude that the outcome of the trial was not affected by the error and that the trial's fairness, integrity, and reputation were not impugned. Vest is therefore entitled to no relief for this error.

*C. Time Limitation on Cross-examination*

█ Vest next contends that his rights under the Confrontation Clause were violated because he was unable to cross-examine two of the Government's experts on matters specifically covered during direct examination. As mentioned above, this trial raised complex issues regarding the propriety of numerous medical procedures performed on 36 different patients. Faced with massive amounts of potential evidence, the District Court imposed time limits on the cross-examination of the Government experts. When Vest's counsel reached those time limits, the District Court prohibited further questioning even though Vest's counsel had not yet cross-examined the experts regarding four of the patients. Vest acknowledges that district courts have discretion to limit cross-examination, but he contends that the absolute prohibition of further questioning after the time limits expired violated his constitutional rights.

█ The Confrontation Clause guarantees to an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This clause has been held to protect a criminal defendant's "right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). The right to cross-examine, however, has its limits. "Beyond certain essential areas of cross-examination, such as those involving key witnesses or issues, the right to cross-examine is subject to limits imposed by the trial court in the exercise of its discretion." *United States v. Saunders*, 973 F.2d 1354, 1358 (7th Cir. 1992). In other words, a trial court may limit cross-examination "after the questioner has had reasonable chance to pursue the matters raised on direct." *United States v. Caudle*, 606 F.2d 451, 459 (4th Cir.1979); *see also Tague v. Richards*, 3 F.3d 1133, 1138 (7th Cir.1993).

Vest asserts that he did not have such an opportunity to address a number of patients and procedures covered on direct examination. The crucial issue, of course, is what counts as a "reasonable chance" to cross-examine. If the District Court had directly prohibited Vest from inquiring into certain subjects raised on direct, he certainly would have been denied his reasonable chance. The District Court, however, set a *time* limitation on cross-examination, and during his allotted time Vest had every opportunity to cover whatever patients and procedures he desired. Vest's failure to address matters raised on direct might therefore be attributed to Vest's poor time management during cross-examination.

Blaming it all on Vest, however, assumes that he could have completed his cross-examination had he just used his time wisely. Was the time Vest was allotted sufficient for a reasonable cross-examination? On the one hand, the District Court ultimately gave Vest over three times the amount of time that the Government used on direct for each of the three experts. That statistic suggests that Vest had abundant time for cross-examination. On the other hand, Vest reasonably argues that judging the adequacy of cross-examination by the length of direct examination is misleading and particularly so in this case. Whereas the Government experts could testify quite quickly and summarily on

direct examination that the tests Vest ordered were unnecessary, challenging that testimony symptom by symptom and test by test takes much longer.

■ In the past, we have explicitly approved the use of time limitations in civil trials, *see, e.g., M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1408–09 (7th Cir.1991); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1170–72 (7th Cir.1983), but we have warned that rigid hour limits may "engender an unhealthy preoccupation with the clock." *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 473 (7th Cir.1984). Our concern about time limits is even greater in criminal cases where a defendant's Confrontation Clause rights may be threatened by an arbitrary cutoff of cross-examination. When curtailing cross-examination, therefore, a trial judge must "exercise judgment in deciding when the point of diminishing returns has been reached, or passed—a judgment that will depend on the particulars of each case, and on such unreviewable imponderables as the judge's assessment of the jury's comprehension and attention span." *United States v. Pulido*, 69 F.3d 192, 204 (7th Cir.1995) (quoting *United States v. Herrera–Medina*, 853 F.2d 564, 566 (7th Cir.1988)).

A rigid adherence to time limitations would prevent such a particularized judgment. The District Court in this case, however, showed flexibility when setting and enforcing the time limits. Before the Government expert testimony began, the District Court issued an order asking the parties to estimate the time needed for direct and cross-examination. The District Court noted that it would take into account the anticipated content of the testimony and that the parties could request additional time after the allotted time expired if good cause was shown. For the first government expert, the Government used a little over three hours on direct, and the District Court then initially allotted Vest seven hours for cross. When that time expired, the Court gave Vest another three hours but warned that the disorganized cross-examination might be going over the heads of the jurors. At the end of the ten-hour time limit,

Vest's counsel ended his questioning without objection.

Vest's counsel objected, however, when the District Court curtailed the cross-examination of two of the experts. For the first of these experts, the District Court gave Vest an extra half-hour after the initial time expired, thereby giving Vest a total of over seven hours to cross-examine a witness the Government questioned in one-third of that time. When even the extended time ran out, the District Court noted that defense counsel had asked questions about tests the Government had not even mentioned on direct and that many of the questions on cross had been repetitive. The trial judge stated his suspicion that Vest was "setting this thing up on a grounds for appeal because if I gave you till the rest of the day, I don't think you would be through." For the other expert, the Government used less than two hours on direct, and Vest was initially given six hours for cross. The District Court, however, extended that time to seven hours and twenty minutes but refused to extend it further because Vest had asked repetitive questions and questions regarding matters not brought out on direct.

■ We think Vest had the "reasonable chance" to pursue matters covered on direct that the Confrontation Clause protects. The District Court's time limits were reasonably anchored to the defendant's own requests for time and to the amount of time the Government used on direct. The District Court's willingness to bend the time limits shows flexibility, *cf. MCI*, 708 F.2d at 1171–72, and its decision to end cross-examination only after concluding that Vest's counsel was wasting time with repetitive questions shows the particularized judgment necessary for limiting cross-examination. Time limits are best used as guideposts rather than deadlines in criminal trials, and time limits are no substitute for involved trial judges who must always shepherd trials along, curtailing repetitive, irrelevant, and immaterial questioning. A district court "violates the Sixth Amendment only where it has so abused its discretion as to prevent the jury from making a discriminating appraisal of the witness' testimony." *United States v. Valles*, 41 F.3d

355, 359 (7th Cir.1994). The District Court here did not prevent the jury from making such an appraisal. Rather, the failure to reach every patient and procedure on cross-examination was the result of the excessive detail in which Vest's counsel cross-examined the experts regarding the other patients and procedures.

### D. Limitation on Exculpatory Evidence

■■■ Vest next argues that the District Court abused its discretion when it limited the introduction of three types of exculpatory evidence.[3] First, Vest argues that the District Court should have allowed him to present as witnesses other patients who were happy with his medical care and who were successfully treated for symptoms that they did not report to Vest. The fact that Vest had many patients who were apparently satisfied with his care, however, hardly precludes the possibility that he defrauded other patients. Moreover, the District Court addressed this issue in a ruling on Vest's motion in limine, but the court's ruling allowed Vest "to seek leave from the Court to present the testimony of other patients if such testimony would be relevant for a specific purpose." Vest never sought such leave at trial, therefore making it too late to reopen the issue now on appeal. *See United States v. Harvey*, 959 F.2d 1371, 1374–75 (7th Cir.1992).

■■■ Second, Vest also argues that he should have been allowed to introduce evidence that his charges for medical care were reasonable. The issue at trial, however, was not whether Vest charged too much per procedure, but rather whether Vest charged for too many procedures in the first place. Evidence that his fees per procedure were reasonable would have been irrelevant.

■■■ Third, Vest contends that the District Court improperly excluded psychiatric expert testimony that many of the patients at trial suffered from "a mental disease or defect that would have made it virtually impossible for them to remember symptoms that occurred years before." Appellant's Br. at 46. Vest says his expert would have testified regarding numerous scientific studies showing that patients have trouble recalling what symptoms they previously reported to doctors and nurses. When defense counsel started down this line of questioning at trial, however, he hardly made it clear where he was going with the testimony. Vest's expert—a neurologist and psychiatrist—was in the middle of testifying about whether a particular MRI scan was medically necessary when defense counsel asked the expert why this particular patient would have denied certain symptoms. The Government objected. In response, defense counsel said that the defense had disclosed the expert's testimony in discovery reports and that the defense hoped to elicit the expert's "psychiatric opinion as to ... why a patient would make such statements." The District Court sustained the objection. Defense counsel then immediately moved from asking about the particular patient to ask the expert whether he was

---

**3.** In the section of his brief devoted specifically to the District Court's exclusion of this evidence, Vest throws in two cursory arguments regarding evidence that the District Court *admitted* at trial. Neither argument has merit. First, the prosecutor's statement during closing arguments that Vest had an "income" of $21.4 million as opposed to "revenue" of $21.4 constitutes a reasonable use of the word "income" (which can mean "commercial revenue or receipts of any kind," *see* Webster's Third New International Dictionary 1143 (1986)), and it certainly does not rise to the level of reversible error. .

Second, Federal Rule of Evidence 704(b) did not prohibit one of the Government's experts from testifying that the only reason Vest would have ordered certain medical tests was for money. Rule 704(b) prohibits an expert who is "testifying with respect to the mental state or condition of a defendant in a criminal case" from

further stating "an opinion or inference as to whether the defendant did or did not have the mental state ... constituting an element of the crime charged." Rule 704(b) "was designed to avoid the confusion and illogic of translating the 'medical concepts' relied upon by 'psychiatrists and other mental health experts' into legal conclusions." *United States v. Lipscomb*, 14 F.3d 1236, 1241 (7th Cir.1994). The Government expert, however, was never billed as a psychiatrist and did not testify based on any psychiatric analysis of Vest's mental processes. *See id.* at 1242. Rather, the expert testified based on how doctors normally practice medicine and on what could possibly justify the tests Vest ordered. Rule 704(b) is a narrow exception to the general rule that experts may state opinions on ultimate issues, *see* Fed.R.Evid. 704(a), and the Government expert's testimony does not fall within that exception.

aware "of any study … that deals with patient recollection of events such as we have discussed." The Government objected on relevance grounds, and the District Court sustained the objection. Defense counsel made no attempt at an offer of proof and, indeed, made no further mention of the issue.

■■■ This circuit does not require litigants to make formal offers of proof when evidence is excluded, but "the record must show the equivalent: grounds for admissibility, the proponent must inform the court and opposing counsel what he expects to prove by the excluded evidence, and he must demonstrate the significance of the excluded testimony." *United States v. King*, 75 F.3d 1217, 1223 (7th Cir.1996); *see also United States v. Peak*, 856 F.2d 825, 832 (7th Cir.1988); Fed. R.Evid. 103(a)(2). In this case, the record is hardly clear regarding what defense counsel was hoping to prove. With no warning to the court, defense counsel shifted gears from neurological questions about the necessity of medical tests to a psychiatric question about why a particular patient would have denied certain symptoms. Defense counsel then asked two broad questions about medical studies but dropped the matter after one objection was sustained. Counsel made no effort to tell the court what the expert would have said or the basis of such testimony. Defense counsel did not mention any "mental disease or defect" that would affect memory, and defense counsel asked the expert only about studies that "deal with" patient recollection, never alerting the court as to what those studies actually conclude. The discovery reports might have been sufficient to put the *Government* on notice regarding the expert's testimony, but merely mentioning the reports at trial did not give the *District Court* a fair chance to decide the relevance of the testimony.

Later, during the direct examination of Vest, defense counsel brought up the medical studies again and this time informed the court about their substance. At that point, however, the studies truly were irrelevant because Vest has no special expertise in psychiatry or psychology that would make his testimony regarding the studies meaningful. By failing to alert the court when the evidence might have been relevant, Vest forfeited the issue, and we will review the exclusion of the evidence only for plain error. *See United States v. Martinez*, 988 F.2d 685, 701 (7th Cir.1993) ("Where the grounds for admission of evidence are not readily apparent, counsel should alert the court to his theory, and failure to do so is reason enough for the appellate court to confine its review to plain error."). Trial courts have broad discretion to admit or exclude expert testimony, *see United States v. Smith*, 869 F.2d 348, 351 (7th Cir.1989), and we do not think the exclusion of the expert's testimony seriously affected "the fairness, integrity or public reputation" of Vest's trial, *see Olano*, 507 U.S. at 736, 113 S.Ct. at 1778; *Waldemer v. United States*, 106 F.3d 729, 732 (7th Cir.1996). The trial court therefore did not commit plain error.[4]

*E. Failure to Sever Counts*

■■■ Vest next argues that the District Court should not have denied his motion to sever the counts in the indictment. Vest argues that the 36 counts that ultimately went to the jury made the trial "irretrievably confused" and therefore prejudicial to him. Federal Rule of Criminal Procedure 14 authorizes a trial court to order "separate trials of counts" where "it appears that a defendant or the government is prejudiced by a joinder of offenses … for trial together." We review a denial of a motion to sever, however,

---

4. Vest asserts in his appellate brief that, in addition to the excluded evidence discussed above, "[n]umerous other instances of brain damage, demyelinating disease, strokes, concussions, and other brain syndromes relating to memory were proffered by the defendant" but excluded by the District Court. Appellant's Br. at 47. Vest, however, makes no specific citations to the record, the transcript of which alone runs over 9,000 pages. Federal Rule of Appellate Procedure 28(a)(6) requires that an appellant's argument

"contain the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on." Vest has failed to identify facts from the record to support any argument based on these "numerous other instances," and Vest has therefore waived such an argument on appeal. *See United States v. Mason*, 974 F.2d 897, 901 (7th Cir.1992); *United States v. Fazio*, 914 F.2d 950, 959 n. 15 (7th Cir.1990).

only for a clear abuse of discretion. *United States v. Windom*, 19 F.3d 1190, 1197 (7th Cir.1994); *United States v. Kendall*, 665 F.2d 126, 137 (7th Cir.1981).

 As evidenced by the number of counts and the medical issues involved in each count, this trial was obviously a complex one. The District Court itself noted that if the case had to be tried again after appeal, the second time around the court would sever the counts into smaller groups. In complex trials such as this one, district courts must "vigilantly monitor for developing unfairness and should not hesitate to order severance at any point after indictment if the risk of real prejudice grows too large to justify whatever efficiencies a joint trial does provide." *United States v. Coleman*, 22 F.3d 126, 134 (7th Cir.1994). Vest has not convinced us, however, that the District Court here failed to protect him from prejudice. The issues and testimony were complicated, but the District Court allowed both sides to submit summary charts to the jury to help the jury consider the evidence count by count. The District Court also gave a pattern jury instruction which directed the jury to consider the counts separately. *See* 1 Federal Criminal Jury Instructions of the Seventh Circuit § 7.03 (1980); *see also Coleman*, 22 F.3d at 135. The jury, moreover, seems to have taken the instruction to heart because it returned not guilty verdicts on two counts. For his severance argument to succeed, Vest must show not just that separate trials would have given him a better chance of acquittal but that the failure to sever prevented him from receiving a fair trial. *See United States v. Studley*, 892 F.2d 518, 523 (7th Cir.1989). Severing the counts would certainly have made for shorter and simpler trials than the marathon trial that occurred, but Vest has not met his burden of showing that his long and complicated trial was unfair.

### F. Ineffective Assistance of Counsel

Vest also contends that he deserves a new trial because he received ineffective assistance from his counsel. Vest cites, among other things, the failure to finish the cross-examination of Government experts, the failure to object to some of the Government experts' testimony, and the failure to introduce other exculpatory evidence. Claims of ineffective assistance of counsel are reviewed under the standard announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That standard requires a defendant to show 1) that identified acts or omissions by defense counsel "were outside the wide range of professionally competent assistance," *id.* at 690, 104 S.Ct. at 2065 and 2) that "a reasonable probability [exists] that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2067.

 We first note that Vest was represented by two attorneys at trial. One was an experienced trial attorney, and the other—though inexperienced with trial practice—was a physician and surgeon. Thus, although the trial presented numerous complex medical issues, Vest had both trial and medical expertise on his defense team. Second, Vest fails to flesh out many of his contentions that his counsel provided ineffective assistance. He baldly asserts, for example, that defense counsel failed "to obtain and introduce exculpatory evidence with respect to" three of Vest's patients and that defense counsel failed "to properly introduce exculpatory medical records." With nothing more to support these bare-bones allegations, however, we can hardly conclude that they justify giving Vest a new trial. Third, the errors that Vest does sufficiently identify do not require reversal under the *Strickland* standard. Defense counsel's failure to finish cross-examination regarding all of the medical procedures raised on direct, for instance, may well have been part of a reasonable strategy to explore some of the procedures in greater detail and thereby cast doubt on the rest of the Government's case as well. And defense counsel's failure to object immediately when an expert buttressed the credibility of other witnesses does not require reversal under the second prong of *Strickland*. As discussed above in Part II.B, that error was rectified when defense counsel finally did object and the trial court instructed the jury that no expert could vouch for the credibility

of other witnesses. Such a limited trial mistake, which the trial court even told the jury to disregard, does not create a reasonable probability that the outcome would have been different but for the mistake. Vest received constitutionally-sufficient assistance from his counsel, and his claim therefore fails.

### G. *Sufficiency of the Evidence*

Finally, Vest asserts that the evidence at trial was insufficient to support his conviction. We will not reverse a conviction for insufficient evidence unless no rational juror could have found the defendant guilty on the evidence presented. *United States v. Jewel*, 947 F.2d 224, 231 (7th Cir.1991). We review the evidence, moreover, in the light most favorable to the Government. *United States v. Yusufu*, 63 F.3d 505, 508 (7th Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995). At trial, the Government presented evidence that Vest was in a precarious economic position, that he failed to follow normal sequences when conducting medical tests, that he reported false symptoms on patient records, and that he ordered unnecessary tests. The heart of Vest's response, meanwhile, consisted of three medical experts, two of whom were blood relatives of Vest. This is not a case where "the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt," Pulido, 69 F.3d at 205–06, and we therefore will not reverse Vest's conviction.

The judgment of the District Court is AFFIRMED.