**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

MOHAMED JAWARA, also known as
Haji Jawara,
        *Defendant-Appellant.*

No. 05-30266

D.C. No.
CR-04-00511-JLR

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
May 1, 2006—Seattle, Washington

Filed September 15, 2006
Amended January 19, 2007

Before: Stephen Reinhardt, M. Margaret McKeown, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge Reinhardt

**COUNSEL**

Ralph Hurvitz, Seattle, Washington, for the defendant-appellant.

Michael J. Lang, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

**ORDER**

The Opinion filed on September 15, 2006, slip op. 11351, and appearing at 462 F.3d 1173, is amended as follows:

1. At slip op. 11381 (462 F.3d at 1190), replace lines 10 through 38 (beginning with the sentence, "Agent Smalley's testimony" and ending with "tribal designation") with the following:

> Although Jawara raised a general Confrontation Clause issue in his briefs to this court, it was not until the Petition for Rehearing that Jawara, along with amicus curiae, the National Association of Criminal Defense Lawyers, first addressed whether the expert's reliance on the country report is testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004). This is a significant question given the traditional reliance on State Department country reports in immigration proceedings. We do not need to reach this issue, however, because the comparative country conditions were not central to the charges here and the admission of this testimony was harmless. *Rahm*, 993 F.2d at 1415. The same is true with respect to

Agent Smalley's testimony regarding the computer indices and the location of the Maraka tribe.

2. At slip op. 11388 (462 F.3d at 1194), add the following paragraph at the end of Judge Reinhardt's dissent:

> Because I would reverse on misjoinder, I need not consider whether the Confrontation Clause also requires reversal, under *Crawford v. Washington*, 541 U.S. 36 (2004). However, as I have stated, the evidence on the document fraud charge is comparatively weak. Thus, I do not agree with the majority's determination of harmless error with respect to the expert testimony regarding the State Department country reports.

With these amendments, the panel has voted to deny the petition for panel rehearing. No further petitions for rehearing will be entertained.

---

## OPINION

McKEOWN, Circuit Judge:

Mohamed Jawara (a.k.a. Haji Jawara) appeals from his convictions for document fraud related to his personal asylum application and conspiracy to commit marriage fraud to avoid the immigration laws. Jawara challenges the district court's denial of his motions to sever the two counts, to suppress physical evidence, and to conduct a pre-trial hearing addressing the reliability of expert testimony, as well as various evidentiary rulings by the district court. We focus primarily on Jawara's claim of misjoinder and clarify the framework for assessing whether the joined offenses are of the "same or similar character" under Federal Rule of Criminal Procedure 8(a). Looking to the indictment, we conclude that the two counts

are unrelated in nature and purpose, temporal scope, physical location, modes of operation, and key evidence. To suggest that joinder is proper simply because each involves an immigration matter would stretch the "same or similar character" basis for joinder beyond reasonable limits. Although we hold that the counts were in fact misjoined, error does not warrant reversal in this case. Nor did the district court commit reversible error with respect to the other matters challenged by Jawara. We affirm the convictions.

## BACKGROUND

In December 2000, "Haji Jawara" executed Immigration and Naturalization Service form I-589, an application for asylum and withholding of removal. In this application, he claimed, among other things, to be a native of Sierra Leone and a member of the Maraka tribe who had suffered imprisonment and witnessed the killing of his parents at the hands of rebels in Sierra Leone. The asylum application was prepared by a man who called himself "Mohamed Ali." Copies of two identity documents were attached to the asylum application: a Republic of Sierra Leone identity card and a "Death Certificate" purportedly issued by the Ministry of Health of the Republic of Sierra Leone. Although the "Death Certificate" was apparently submitted to certify Haji Jawara's birth in Sierra Leone, the certificate, in fact, stated that Haji Jawara "died 4th July 1979 at 6:45 p.m. at Kono Government Hospital" in Sierra Leone.

Three years later, Darrick Smalley, a senior special agent with Immigration and Customs Enforcement, began investigating the activities of "Mohamed Jawara," as part of a larger investigation involving several individuals. During the course of his investigation, Agent Smalley discovered that "Mohamed Jawara" was also using the name "Haji Jawara," and that in 1999, "Mohamed Jawara" had submitted applications for a visa and a social security number, in which he claimed

The Gambia as his birthplace and provided his Gambian passport.

The following year, while this investigation was still pending, Jawara approached his friend Peter Coleman for help in finding a citizen to marry his friend "Ibrahim" for immigration purposes. Coleman, unbeknownst to Jawara, was a paid informant who had assisted federal law enforcement authorities in several cases since his own arrest in 2001. In June 2004, Coleman met Jawara and Ibrahim at a coffee shop and introduced them to Carol, a prospective marriage candidate. They discussed the mechanics of a potential sham marriage, including housing and living arrangements. Coleman wore a recording device during this meeting, and federal agents, including Agent Smalley, monitored the meeting and took photographs. Some months later, Coleman had another meeting with Jawara, also recorded, at which Jawara sought Coleman's help in finding a wife for himself.

In November 2004, law enforcement officials arrested Jawara and executed a search warrant at his apartment, where they recovered various documents, including his Sierra Leone identity card and death certificate. A grand jury indicted Jawara on one count of fraud related to immigration documents, in violation of 18 U.S.C. § 1546(a), and one count of conspiracy to commit marriage fraud, in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1325.

The document fraud charge read, in pertinent part:

> On or about December 23, 2000, . . . MOHAMED JAWARA, aka: HAJI JAWARA, did knowingly make false statements under oath, and . . . knowingly subscribed as true, false statements with respect to a material fact in an application . . . required by the immigration laws or regulations prescribed thereunder, and knowingly presented such application

> . . . which contained such false statement . . . that is,
> in an Immigration and Naturalization Service Form
> I-589 (Application for Asylum or For Withholding
> of Removal), the defendant made the following false
> statements . . . .

The false statements alleged in the superceding indictment included Jawara's response of "Sierra Leone" to questions regarding his nationality and birthplace.

The marriage fraud conspiracy charge read, in pertinent part:

> At an exact time unknown, but beginning within the
> past five years and continuing until on or around
> November 13, 2004 . . . MOHAMED JAWARA,
> aka: HAJI JAWARA, and others . . . did knowingly
> and willfully conspire . . . to enter into, and to aid
> and abet others to enter into, a marriage for the pur-
> pose of evading any provision of the immigration
> law . . . .

The superceding indictment alleged that Jawara committed the following overt acts in furtherance of the marriage fraud conspiracy:

> a.  On or about June 24, 2004, . . . JAWARA did
>     facilitate a meeting between a cooperating wit-
>     ness, identified as P.C., an alien, and a female
>     United States citizen, in which the conspirators
>     discussed having the United States citizen marry
>     the alien in order to evade the immigration laws
>     of the United States.
>
> b.  On or about November 13, 2004, . . .
>     JAWARA[ ] did meet with and solicit a cooper-
>     ating witness, identified as P.C., to procure a
>     United States citizen who would agree to marry

JAWARA in order to evade the immigration
laws of the United States.

Prior to trial, Jawara moved to sever the two counts, assert-
ing misjoinder under Federal Rule of Criminal Procedure 8(a)
and prejudicial joinder under Federal Rule of Criminal Proce-
dure 14. Jawara also moved to suppress the documentary evi-
dence seized during the search of his residence. After a
hearing, the district court denied both motions.

Jawara also moved *in limine* to exclude the proposed expert
testimony of Carolyn Bayer-Broring, a forensic document
examiner employed by the Department of Homeland Security,
regarding the authenticity of Jawara's documents from Sierra
Leone. Jawara requested a separate hearing to assess the reli-
ability of Bayer-Broring's expert testimony. After an *in limine*
hearing, the district court denied the motion to exclude the
expert testimony and determined that a separate *Daubert* hear-
ing was unnecessary. *See Daubert v. Merrell Dow Pharma-
ceuticals, Inc.*, 509 U.S. 579 (1993). The district court also
denied Jawara's motions *in limine* to exclude certain aspects
of Agent Smalley's testimony and school examination records
from The Gambia listing Mohamed Jawara as a local student.

At trial, Agent Smalley testified about his role in the inves-
tigation, the asylum process in general, and the importance of
country conditions in asylum determinations. Over defense
counsel's objections, Agent Smalley testified that: (1) based
on his review of State Department country reports, country
conditions in Sierra Leone were comparatively worse than in
The Gambia; (2) a substantially larger percentage of asylum
applications were received from natives of Sierra Leone than
The Gambia; and (3) based on his review of various computer
indices, including a site called "ethnolog.com," the Maraka
tribe (to which Jawara had claimed membership in his asylum
application) was not located in Sierra Leone but in The Gam-
bia. Citing expertise in the area of forensic document exami-
nation, Bayer-Broring also testified that the Sierra Leone

identity card and death certificate recovered from Jawara's apartment were counterfeit.

The government's case included the testimony of two cooperating witnesses: Essa Jobarteh and Peter Coleman. Jobarteh testified that he was Jawara's high school classmate at St. Augustine's Secondary School in The Gambia from 1995 to 1998 and that he knew Jawara by the names "Haji" and "Mohamed." Jobarteh became reacquainted with Jawara in 2004 at a party in the Seattle area. Jobarteh testified that when he sought Jawara's advice about securing asylum in the United States, Jawara advised him to get married instead because "it's quicker to get your papers" and to marry an older woman because they were "kind of more desperate." Over defense counsel's objection, the court admitted two examination records issued by the West African Examinations Counsel, listing Mohamed Jawara as a student at St. Augustine's in The Gambia.

Coleman testified that Jawara represented himself as a Gambian whose parents were still alive, that he knew Jawara by the names "Haji" and "Mohamed," and that he and Jawara had spoken generally about how "you can use someone else's documents from another country" for immigration purposes. Coleman recounted his discussions with Jawara about finding a wife, first for Ibrahim, and then later, for Jawara himself. The recorded meetings were played for the jury. During the November 2004 meeting, Jawara was recorded as saying that he needed a wife for himself because he was "going through some stuff with the INS . . . about [his] papers" and that he wanted to "finish [his] stuff and get [his] citizenship."

The defense's case consisted of Jawara's testimony. Jawara testified that his real name was Haji, he was born in Sierra Leone, and "Mohamed Jawara" was the name of his Gambian cousin, whose passport he borrowed to enter the United States. He admitted using Mohamed Jawara's passport and name to obtain various identity cards in the United States, but

after a few months, he sent the passport back to The Gambia. With respect to the document fraud charge, Jawara acknowledged several falsehoods in his asylum application, including the nature of his parents' death. He maintained that he was unaware of the falsehoods at the time the application was filed because he was misled by Mohamed Ali,[1] who prepared the application. Jawara testified that aside from providing Ali with copies of his Sierra Leonean identity card and death certificate, he had no role in preparing the application and read no part of it before signing. Jawara denied attending high school with Jobarteh in The Gambia or advising him to marry a citizen. Jawara maintained that the fraudulent marriage idea originated with Coleman and that Coleman initiated all discussions and meetings on the subject.

The jury returned a guilty verdict on both counts. The district court sentenced Jawara to ten months confinement, followed by two years of supervised release.

## ANALYSIS

### I.   JOINDER AND SEVERANCE

Jawara argues the two counts were improperly joined under Rule 8(a). Alternatively, he argues that even if the initial joinder was proper, the district court should have severed the counts under Rule 14 because the joinder was prejudicial.

[1] Rule 8(a) provides for joinder of offenses against a single defendant in the indictment if one of three conditions is satisfied. The offenses charged must be: (1) "of the same or similar character;" (2) "based on the same act or transaction;"

---

[1]The real name of this individual was apparently "Souleymane Camara." The superceding indictment also charged Camara and two other defendants with multiple counts of immigration fraud; the government agreed to sever Jawara's trial from the proceedings of the other named defendants.

or (3) "connected with or constitut[ing] parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Misjoinder of charges under Rule 8(a) is a question of law reviewed de novo. *United States v. Terry*, 911 F.2d 272, 276 (9th Cir. 1990).

Rule 14 permits the district court to "order separate trials of counts" at its discretion "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a). Thus, "[e]ven if joinder is permissible under Rule 8, a party who feels prejudiced by joinder may move to sever pursuant to [Rule] 14." *United States v. Smith*, 795 F.2d 841, 850 (9th Cir. 1986), *cert. denied,* 481 U.S. 1032 (1987).

## A.   JOINDER UNDER RULE 8(A)

[2] We take the view that "[b]ecause Rule 8 is concerned with the propriety of joining offenses in the indictment, the validity of the joinder is determined solely by the allegations in the indictment." *Terry*, 911 F.2d at 276; *see also United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995) ("In making our assessment, we examine only the allegations in the indictment."). Thus, in *Terry*, we observed that "there is no need to assess what actually happened in the trial" as part of a Rule 8 inquiry.  911 F.2d at 277. Though on occasion, our decisions have noted matters outside of the indictment,[2] the established rule in this circuit is that a valid basis for joinder should be discernible from the face of the indictment,[3] and

---

[2]For example, in *VonWillie*, we recited the "indictment-only" standard and explained that joinder was proper because the "indictment charges [defendant] in count 1 with possessing the same three weapons that he is charged in count 2 with using in relation to a drug trafficking crime"; however, we went on to note that "[t]estimonial and physical evidence . . . is also common to both counts." 59 F.3d at 929. Similarly, in *United States v. Fiorillo*, 186 F.3d 1136, 1145 (9th Cir. 1999) (per curiam), we noted that "at least three witnesses testified at the trial concerning both" counts.

[3]The majority of circuits apply the "indictment-only" standard, as we do —at least in name, if not always in practice. *See, e.g., United States v. But-*

we remain faithful to that principle here.[4]

Because Rule 14 is available "as a remedy for prejudice that may develop during the trial," Rule 8 has been "broadly construed in favor of initial joinder . . . ." *United States v. Friedman,* 445 F.2d 1076, 1082 (9th Cir. 1971).[5] Nonetheless,

---

*ler*, 429 F.3d 140, 146 (5th Cir. 2005) ("Whether the initial joinder of charges was improper under Rule 8 . . . is judged according to the allegations in the . . . indictment."); *United States v. Chavis,* 296 F.3d 450, 456 (6th Cir. 2002) (same); *United States v. Wadena*, 152 F.3d 831, 848 (8th Cir. 1998) (same); *United States v. Coleman*, 22 F.3d 126, 134 (7th Cir. 1994) (same); *United States v. Natanel*, 938 F.2d 302, 306 (1st Cir. 1991) ("In the ordinary case, a rational basis for joinder of multiple counts should be discernible from the face of the indictment.").

[4]We note that some of our sister circuits have adopted a modified approach. For example, the Fourth Circuit has explicitly held that "compliance with Rule 8(a) is determined by examining the indictment *and evidence presented at trial*." *United States v. Cardwell,* 433 F.3d 378, 385 n. 1 (4th Cir. 2005) (emphasis added). Two other circuits have explicitly held that courts may consider governmental proffers of evidence before trial, in addition to allegations in the indictment, when assessing the propriety of joinder under Rule 8. *See United States v. Dominguez*, 226 F.3d 1235, 1241 (11th Cir. 2000) ("It is enough that when faced with a Rule 8 motion, the prosecutor proffers evidence which will show the connection between the charges."); *United States v. Halliman,* 923 F.2d 873, 883 (D.C. Cir. 1991) ("In this circuit, . . . the government need not demonstrate the propriety of its joinder decisions on the face of the indictment . . . . Rather, the government need only present evidence before trial [justifying joinder].").

[5]Several circuits embrace this justification for broadly construing initial joinder. *See, e.g., United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996) ("Rule 8(a)'s joinder provision is generously construed in favor of joinder . . . in part because [Rule] 14 provides a separate layer of protection where it is most needed."); *Coleman,* 22 F.3d at 134 (explaining the "respective roles of Rule 8 and Rule 14"). Although this rationale makes sense in theory, commentators have questioned this justification in practice: "Given the evident reluctance of . . . courts to grant separate trials under Rule 14, a broad interpretation of Rule 8 means broad joinder, whether or not this is just or fair." 1A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 143 (3d ed. 1999); *see also* Note, *Harmless*

the joinder decision warrants scrutiny, and Rule 14 should not be viewed as a backstop or substitute for the initial analysis required under Rule 8(a). At least one of Rule 8(a)'s three conditions must be satisfied for proper joinder, and "those conditions, although phrased in general terms, are not infinitely elastic." *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996); *see also United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005). In Jawara's case, the government invokes two of the three bases for joinder: that the counts formed part of a "common scheme or plan" to engage in immigration fraud, and that the counts were of a "similar character."

### 1. "Common Scheme or Plan"

We have not specifically defined the requisite nexus for a "common scheme or plan"; because the words are self-defining, courts generally permit joinder under this test where the counts "grow out of related transactions." *See Randazzo*, 80 F.3d at 627. Stated another way, we ask whether "[c]ommission of one of the offenses [ ]either depended upon [ ]or necessarily led to the commission of the other; proof of the one act [ ]either constituted [ ]or depended upon proof of the other." *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978); *see also United States v. Anderson*, 642 F.2d 281, 284 (9th Cir. 1981) ("When the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate.") (citing *United States v. Roselli*, 432 F.2d 879, 899 (9th Cir. 1970)).

---

*Error and Misjoinder Under the Federal Rule of Criminal Procedure: A Narrowing Division of Opinion*, 6 HOFSTRA L. REV. 533, 536 n. 14 (1978) ("For the defendant who goes to trial properly joined under rule 8, the chances of receiving a separate trial at a later time are unlikely at the trial level and even less likely on appeal. . . . It is for this reason that the courts' interpretation of rule 8 and what they first determine to be the bounds of proper joinder are of central importance. A broad interpretation of rule 8 means broad joinder.").

**[3]** Restricting our inquiry to the allegations in the superceding indictment, nothing suggests such a nexus between the two counts. The document fraud count describes acts—knowingly making false statements on an asylum application — that were completed as of December 23, 2000. The marriage fraud conspiracy count describes very different acts—the two meetings between Jawara and a "cooperating witness, identified as P.C."—that occurred several years later, on June 24, 2004 and November 13, 2004. The document fraud charge makes no reference to the "cooperating witness" that is central to the marriage fraud charge, and the marriage fraud charge makes no reference to the asylum application that is central to the document fraud charge. Aside from the subject matter of immigration, the superceding indictment does not offer a discernable link between the two offenses or suggest any overlapping evidence. No plan or common scheme links the charges nor can any commonality be inferred from the indictment. *See Terry*, 911 F.2d at 276 ("No effort is made in the indictment even to suggest that the offenses are . . . parts of a common scheme.").

This case stands in marked contrast to situations where we have determined that a "common scheme or plan" exists; such cases typically involve a concrete connection between the offenses that goes beyond mere thematic similarity. For example, in *United States v. Kinslow,* 860 F.2d 963, 965 (9th Cir. 1988)*, cert. denied,* 493 U.S. 829 (1989), *overruled on other grounds by United States v. Brackeen*, 969 F.2d 827, 830 (9th Cir. 1992), a prison escapee forced a family at gunpoint to transport him across state lines and he then sexually molested one of the children. We concluded that the charges of kidnaping, interstate transportation of a minor, unlawful transportation of firearms, and stolen property were properly joined in the indictment because "[t]he incidents listed in the indictment all took place *within the same 24 hour time period* and they all made up part of Kinslow's common plan to get to California with the . . . family as his hostages." *Id.* at 966 (emphasis added).

In a case involving joined counts of espionage and tax eva-
sion, we held that the charges were part of a common plan or
scheme even though they occurred at different times because
the "tax evasion *flow[ed] directly* from" the espionage activ-
ity and the tax evasion "*result[ed]* in large part from the
necessity of concealing the illegal proceeds of that activity."
*United States v. Whitworth*, 856 F.2d 1268, 1277 (9th Cir.
1988) (emphasis added). In *Whitworth*, "the money allegedly
received in exchange for classified information was the same
as that involved in the tax charges," a circumstance we distin-
guished from *Halper*, a Second Circuit case deeming Medic-
aid fraud and tax evasion charges unconnected because "the
sums charged in the income tax evasion indictment were not
the same funds embraced in the Medicaid fraud indictment."
*Id.* (quoting *Halper,* 590 F.2d at 429).

**[4]** Here, there is no direct connection between the acts
other than Jawara's participation in both events. For example,
the false statements were not made to bolster or help conceal
the marriage fraud conspiracy, nor can it be said that the mar-
riage fraud conspiracy flowed from the document fraud crime.
Although a close temporal relationship is not, in and of itself,
a sufficient condition for joinder, *see Cardwell*, 433 F.3d at
386, we consider it significant in this case that the alleged acts
underlying the two offenses had no temporal connection and
were separated by several years. "Whatever connection exists
here, it is entirely too speculative to justify joinder" on the
basis of a common scheme or plan. *Halper*, 590 F.2d at 429.

## 2. "Same or Similar Character"

The more difficult question is the government's alternate
basis for joinder— that the offenses are of a "similar charac-
ter" because they relate to immigration fraud. The "same or
similar character" prong of Rule 8(a) is the most amorphous
and controversial of the three grounds for joinder.**⁶** Numerous

---

**⁶**The "same and similar" language, like all of Rule 8(a),"was intended
by the Advisory Committee to be substantially a restatement of the law

courts and commentators have questioned the logic and fairness of such a rule. *See e.g., Randazzo*, 80 F.3d at 627 ("It is obvious why Congress provided for joinder of counts that grow out of related transactions . . . ; the reasons for allowing joinder of offenses having 'the same or similar character' is less clear."); *Halper*, 590 F.2d at 430 ("When all that can be said of two separate offenses is that they are of the 'same or similar character,' the customary justifications for joinder (efficiency and economy) largely disappear. . . . At the same time, the risk to the defendant in such circumstances is considerable."); Note, *Joint and Single Trials under Rule 8 and 14 of the Federal Rules of Criminal Procedure*, 74 YALE L. J. 553, 560 (1965) (recommending "abolition of joinder of similar offenses under Rule 8" given its "lack of utility" and risk of prejudice to the defendant); 1A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 143 (3d ed. 1999) ("Joinder on this ground poses obvious dangers of prejudice to the defendant. . . . [I]t may fairly be asked whether joinder of this kind should ever be allowed. If the offenses arise out of separate and unrelated transactions, there is likely to be little saving in time and money in having a single trial.").

**[5]** Mindful of these significant concerns, we turn to the more immediate question: does the fact that the two offenses relate to immigration fraud make them of a "similar character" for joinder purposes? We have upheld initial joinder on the basis of "similar character" in a handful of decisions. *See, e.g., United States v. Rousseau*, 257 F.3d 925, 932 (9th Cir. 2001) (joinder of two counts of being a felon in possession of a firearm); *United States v. Fiorillo*, 186 F.3d 1136, 1145 (9th Cir. 1999) (per curiam) (joinder of charges relating to wire

applied prior to adoption of the rules." 1A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 141 (3d ed. 1999); *see also Randazzo*, 80 F.3d at 627, n.1. ("The 'same or similar' language was drawn from earlier law without explanation.").

fraud, improper hazardous waste practices in violation of the Resource Conservation and Recovery Act, and improper receipt of explosives); *United States v. Kaplan*, 895 F.2d 618, 621 (9th Cir. 1990) (joinder of counts relating to physician-defendant's controlled substance prescription practices and the filing of false insurance claims); *United States v. Bronco*, 597 F.2d 1300, 1301 (9th Cir. 1979) (joinder of counts of conspiracy to sell counterfeit money, possession of counterfeit money, and passing counterfeit money); *Edwards v. Squier*, 178 F.2d 758, 759 (9th Cir. 1949) (joinder of counts relating to transport of a stolen vehicle, in violation of the Motor Vehicle Theft Act, and transport of stolen securities, in violation of National Stolen Property Act, that occurred on the same day). Aside from the general observation that "similar" character does not mean the "same," *see Edwards*, 178 F.2d at 759, we have offered little guidance in the application of this test.

"Same or similar character" cases often present a situation where "line drawing between permissible and improper joinder . . . becomes imprecise and the standards applied confusing." *United States v. Buchanan*, 930 F. Supp. 657, 662 (D. Mass. 1996). This case underscores the importance of providing more clarity and texture for assessing the propriety of joinder on the basis of "same or similar character," and we endeavor here to fill in some of the blanks.

Our analysis in *Terry* provides a useful jumping-off point, although there, the analysis of the "common scheme" and "similar character" prongs of Rule 8(a) is intertwined, making it difficult to discern the dividing line between the two. In rejecting the "similar character" of drug and firearm offenses in *Terry*, we considered a variety of factors, such as the different dates and locations of the acts underlying the two counts. *Terry*, 911 F.2d at 276 ("Count I and II describe an event occurring on June 9, 1988 in San Joaquin County. Count III describes an event occurring on June 22, 1988 in another city and county. The drug crimes referred to in Counts I and II are

wholly different from the possession of a firearm charge in Count III."). We also considered the fact that the evidence necessary to prove one offense was different from, and did not overlap with, evidence necessary to prove the other offense. *Id.* Thus, we undertook a fairly broad inquiry based on factors that were readily apparent on the face of the indictment or could be reasonably inferred from the allegations in the indictment.

Looking to our sister circuits for guidance in the assessment of "same or similar character," the First and Seventh Circuits have addressed this issue at some length. Although both circuits focus the Rule 8(a) inquiry on allegations in the indictment, *see United States v. Coleman*, 22 F.3d 126, 134 (7th Cir. 1994); *United States v. Natanel*, 938 F.2d 302, 306 (1st Cir. 1991), their respective approaches to "same or similar character" represent two ends of the spectrum.

The Seventh Circuit has adopted a "literal" or "categorical" approach that pays almost exclusive attention to likeness of "class" or "category" of the offenses, *Coleman*, 22 F.3d at 133-34, while the First Circuit utilizes what could be characterized as a broader, more holistic approach that looks to a variety of factors, including temporal proximity and potential for evidentiary overlap. *Cf. United States v. Edgar*, 82 F.3d 499, 503 (1st Cir. 1996).[7]

---

[7]Some other circuits are less easily categorized. For example, *Coleman* cites a Fifth Circuit case, *United States v. Holloway*, 1 F.3d 307 (5th Cir. 1993), as applying a similar "categorical" approach. *Coleman*, 22 F.3d at 133-34. However, temporal proximity was a factor in the Fifth Circuit's analysis in *Holloway*. 1 F.3d at 310-11. In *United States v. Werner*, 620 F.2d 922 (2d Cir. 1980), the Second Circuit seemed to lean toward a literal interpretation of "similar character": "Rule 8(a) is not limited to crimes of the 'same' character but also covers those of 'similar' character, which means '(n) early corresponding; resembling in many respects; somewhat alike; having a general likeness.' " *Id.* at 926 (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed.)). Yet, reading *Werner* in conjunction with *Halper*, the Second Circuit's "same or similar" inquiry considers the extent of evidentiary overlap. *See Halper*, 590 F.2d at 431.

In *Coleman,* a case involving the joinder of four separate weapons possession charges that occurred on different dates, the Seventh Circuit moved away from a "balancing of time and evidence factors" embodied in previous cases, in favor of a "more literal reading of the Rule." 22 F.3d at 134. The court wrote that the "same or similar character" language in Rule 8(a) was a "rather clear directive to compare the offenses charged for categorical, not evidentiary, similarities." *Id.* at 133. Acknowledging the "scant" evidentiary overlap and temporal proximity between the joined offenses, *id.* at 132, the Seventh Circuit in *Coleman* nevertheless upheld joinder: "[s]imply put, if offenses are of like class, although not connected temporally or evidentially, the requisites of proper joinder should be satisfied so far as Rule 8(a) is concerned." *Id.* at 133.

In adopting this "categorical" framework, the Seventh Circuit explained that such an approach is "most consistent with the respective roles of Rule 8 and Rule 14." *Id.* at 134. Namely, the initial joinder decision, based solely on the indictment, offers little "real insight into the actual mutual relevance of the individual offenses and their surrounding circumstances, which only crystallizes with the presentation of evidence at trial." *Id.* The Seventh Circuit concluded that the "natural product" of this limitation is "[a]n uncomplicated inquiry and review of initial joinder," while an "examination of the nature of the evidence and ties between the acts underlying the offenses" is best left to Rule 14 severance decisions —with the extra caution that district courts should be "especially watchful for possible . . . sources of prejudice" in cases of "same or similar character" joinder. *Id.*

We recognize that the initial joinder inquiry under Rule 8, which is confined to allegations in the indictment, offers a more limited opportunity for detailed analysis than its more "flexible" Rule 14 counterpart. *Id.*; *see also Terry,* 911 F.2d at 277 (explaining that a Rule 14 motion to sever, unlike a Rule 8 motion, "must be renewed at the close of evidence or

it is waived," so that the district court can "assess whether a joinder is prejudicial at a time when the evidence is fully developed . . .") (internal quotations and citation omitted). We are nonetheless uncomfortable with a Rule 8 "same or similar character" inquiry that wholly ignores factors relevant to the question of similarity, such as temporal proximity, physical location, modes of operation, identity of the victims, likelihood of evidentiary overlap, and the like, to the extent that they can be gleaned from the indictment. The Seventh Circuit's "categorical" approach, aside from instructing district courts to eyeball the indictment for offenses of a "like class" and encouraging vigilant scrutiny in the Rule 14 context, offers little guidance in close cases. Depending on the level of abstraction (e.g., offenses involving dishonesty, offenses involving an intent to defraud), offenses of a "like class" might encompass a host of otherwise unrelated offenses, making an "uncomplicated" similar character inquiry tantamount to no meaningful inquiry. And any "extra layer" of protection provided by Rule 14 "does not relieve the trial court [or a reviewing court] of its responsibility to ensure that joinder is proper in the first instance." *Buchanan*, 930 F. Supp. at 662 n.14. Although the "like class" standard provides a useful benchmark, in our view it is too limiting and does not comport with our more expansive inquiry in *Terry*.

Our analysis in *Terry* more closely corresponds to the First Circuit's comprehensive review and its "consider[ation] [of] such factors as 'whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes or operation, and the time frame in which the charged conduct occurred.' " *Edgar,* 82 F.3d at 503 (quoting *United States v. Taylor*, 54 F.3d 967, 973 (1st Cir. 1995)) (holding that workers' compensation and insurance fraud counts were "sufficiently similar" because they involved the same modus operandi, the timing overlapped, and the evidence would also overlap). This framework also considers the "extent of common evidence," particularly, "the *important* evidence." *Randazzo*, 80 F.3d at 628 ("Congress did not provide for joinder

for unrelated transactions . . . merely because some evidence might be common to all of the counts.”).

**[6]** We consider it appropriate to consider factors such as the elements of the statutory offenses, the temporal proximity of the acts, the likelihood and extent of evidentiary overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims in assessing whether an indictment meets the “same or similar character” prong of Rule 8(a). The weight given to a particular factor will depend on the specific context of the case and the allegations in the indictment. But the bottom line is that the similar character of the joined offenses should be ascertainable—either readily apparent or reasonably inferred—from the face of the indictment. Courts should not have to engage in inferential gymnastics or resort to implausible levels of abstraction to divine similarity. Thus, where the government seeks joinder of counts on the basis of “same or similar character,” it crafts a barebones indictment at its own risk.

**[7]** Applying this inquiry to the indictment here, it is apparent that the two counts are not of the “same or similar character.” The indictment alleges two different statutory violations requiring proof of different elements.[8] The underlying acts

---

[8] 18 U.S.C. § 1546, “Fraud and misuse of visas, permits, and other documents,” provides, in relevant part:

Whoever knowingly makes under oath, or as permitted under penalty of perjury . . . knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact—

Shall be fined under this title or imprisoned . . .

8 U.S.C. § 1325, “Improper entry by alien,” provides, in relevant part:

alleged in the indictment are separated by three-and-a-half years, a temporal distance that is not bridged by the "exact time unknown" language appearing at the start of the marriage fraud charge. The lack of any temporal connection is all the more significant because the counts do not stem from common events. As for potential evidentiary overlap, Peter Coleman, the cooperating witness whose centrality to the marriage fraud charge is obvious from the indictment, is notably absent from the document fraud charge; nor is any other evidentiary link ascertainable from the indictment. The indictment evinces no similar mode of operation with respect to the two crimes—lying about being from Sierra Leone on an asylum application is vastly different from facilitating or procuring meetings with prospective marriage candidates. The counts do not involve related geographic locations or related victims of the fraud. Ultimately, the only similarity discernible from the indictment is that both counts involve immigration. Such a "vague thematic connection" cannot, in and of itself, justify joinder. *Buchanan,* 930 F. Supp. at 662.

If subject matter similarity alone were sufficient, wholly unrelated charges for threatening an immigration officer upon initial entry to the United States and participating in an alien smuggling operation several years later could be deemed to be of the "same or similar character." Or, in the drug context, consider the example of a pharmacist who sells, over the counter, unlawful amounts of products containing pseudoephedrine and then, some years later, buys cocaine from a government informant. Both crimes involve drugs and a druggist, but surely such a general thematic commonality does not make the offenses of the "same or similar character." To

---

Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both.

extend the rule so broadly would lead to absurd results and render the "same or similar" test without meaningful limits.

**[8]** Even under the Seventh Circuit's "like class" test, we do not view these two immigration violations as being of "like class." The immigration document fraud charge is, in essence, a perjury claim related to Jawara's national origin. The other charge stems from an arrangement to facilitate sham marriages. The proof is in the framing. We interpret "similar" to mean something beyond facial similarity of subject matter. Looking at the allegations in the indictment, including any reasonable inferences of the connections and similarities that may be drawn about these two counts, we hold that the counts do not qualify as "same or similar" under Rule 8.

### 3. Actual Prejudice

**[9]** According to the Supreme Court, our inquiry does not end here. "A violation of Rule 8 'requires reversal only if the misjoinder results in actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict.' " *Terry*, 911 F.2d at 277 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). This standard, though "exacting," *Rousseau,* 257 F.3d at 932, is less exacting than Rule 14's "manifest prejudice" standard. *See United States v. Lewis*, 787 F.2d 1318, 1321 (9th Cir. 1986) (Under Rule 14, "[t]he defendant has the burden of proving that the joint trial was manifestly prejudicial," such that "defendant's right to a fair trial was abridged."). In any case, we will not presume that "prejudice results *whenever* [Rule 8's] requirements have not been satisfied." *Lane*, 474 U.S. at 449.

In *Lane*, the Supreme Court considered a variety of factors in resolving that misjoinder under Rule 8 did not have a "substantial and injurious" effect on the jury's verdict, including the "overwhelming evidence of guilt shown," the provision of a "proper limiting instruction . . . admonish[ing] the jury to consider each count and defendant separately," and the likeli-

hood that evidence admitted on the misjoined count would have been admissible in a separate trial as evidence of intent under Federal Rule of Evidence 404(b).**⁹** *Id.* at 450. The Court also refused to "necessarily assume that the jury misunderstood or disobeyed" the district court's limiting instruction, and noted that the evidence as to one count "was distinct and easily segregated from evidence" relating to the other counts. *Id.* at 450 n. 13.

**[10]** After carefully reviewing the trial record as a whole, we are comfortable in our analysis that misjoinder did not have a "substantial and injurious" effect on the verdict. A number of factors support this conclusion. We begin with the fact that the district court instructed the jury to treat the charges separately: "A separate crime is charged against the defendant in each count. You must decide each count separately. Your verdict as to one count should not control your verdict on any other count." That "the district court specifically instructed the jury that it was obliged to consider the counts separately . . . . militates against a finding of prejudice." *Rousseau*, 257 F.3d at 932; *see also Fiorillo*, 186 F.3d at 1145 (explaining that even if misjoinder occurred, the court's jury instruction "to deliberate on the elements of each charge separately . . . . militates against a finding of prejudice").

**[11]** In addition, the evidence of guilt was overwhelming as to both counts. *See Lane*, 474 U.S. at 450 ("In the face of overwhelming evidence of guilt shown here, we are satisfied

---

**⁹**Fed. R. Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . .

that the [misjoinder] was harmless."). The recorded meetings and Coleman's testimony conclusively demonstrated Jawara's participation in the marriage fraud conspiracy. Jawara's credibility was not a central issue as he was hard pressed to disavow the recorded admissions. As for the document fraud charge, Jawara admitted numerous falsehoods in his application and acknowledged providing the two Sierra Leonean identity documents to Ali, which Bayer-Broring testified were counterfeit. To the extent that Jawara's credibility was an important factor in the document fraud conviction, his own testimony consisted of numerous credibility-eroding admissions, including his repeated use of his Gambian cousin's name and passport to secure various identity documents in the United States.

Given the strength of the individual cases, we do not confront a situation where prejudice might stem from a disparity of evidence—i.e., a weak case joined with a strong case. *See, e.g., Bean v. Calderon*, 163 F.3d 1073, 1085 (9th Cir. 1998) (explaining that "prejudice resulted from the disparity between the evidence supporting his guilt" as to each of the joined offenses); *Lucero v. Kerby*, 133 F.3d 1299, 1315 (10th Cir. 1998) ("Courts have recognized that the joinder of offenses in a single trial may be prejudicial when there is a great disparity in the amount of evidence underlying the joined offenses.").

[12] Finally, for many of the same reasons that we determined the charges are not similar—the differences in applicable statute, modes of operation, evidence, and time frame— the jury likewise would have had no difficulty distinguishing between the charges and the evidence. Although it is generally "much more difficult for jurors to compartmentalize damaging information about one defendant derived from joined counts, than it is to compartmentalize evidence against separate defendants joined for trial," *Lewis*, 787 F.2d at 1322 (citation omitted), "the jury was not likely in this case to confuse which count particular evidence was introduced to estab-

lish." *United States v. Johnson*, 820 F.2d 1065, 1071 (9th Cir. 1987). The issues in this four-day trial were relatively simple, and the evidence central to the document fraud count—the asylum application, the Sierra Leonean identity documents and Bayer-Broring's testimony—was distinct and easily segregated from evidence central to the marriage fraud count—the recordings and Coleman's testimony. *See, e.g., Lane*, 474 U.S. at 450, n. 13 (noting that misjoinder error was harmless, in part, because "the evidence as to [the counts] was distinct and easily segregated").

In claiming prejudice as a result of the joinder, Jawara offers the general assertion that "evidence of alleged material misstatements in an asylum application would not have been admissible against [him] in a separate trial on the charge of conspiracy to commit marriage fraud, and vice versa." We have observed that one of the ways that joinder of offenses may prejudice a defendant is that "the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged." *Johnson*, 820 F.2d at 1070 (quoting *Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964)). Jawara does not point to any specific "inadmissible" evidence in support of this assertion. Even if some of the evidence would not have been cross-admissible in separate trials, it is likely that the jury was able to "compartmentalize the evidence" in light of the other factors we have described. Thus, in this case, evidence related to one crime did not likely "taint the jury's consideration" of the other crime. *Johnson*, 820 F.2d at 1071; *see also Bean*, 163 F.3d at 1085 ("[P]rejudice generally does not arise from joinder when the evidence of each crime is simple and distinct, even in the absence of cross-admissibility [of the evidence]."); *Drew*, 331 F.2d at 91 ("The federal courts, including our own, have, however, found no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials . . . .").

**[13]** In the absence of prejudice, reversal is not required. Since Jawara has not established that he was prejudiced by the violation of Rule 8, he cannot satisfy the burden of demonstrating "manifest prejudice" under Rule 14.

## II. REMAINING CLAIMS

We briefly address Jawara's remaining claims, although none warrants reversal.[10]

## A. MOTION TO SUPPRESS

We review *de novo* Jawara's argument that the district court should have suppressed the documents seized during the search of his residence because of an alleged material omission in paragraph 42 of Agent Smalley's search warrant affidavit. *United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001). This paragraph reads:

> I began working on this case after determining that an individual calling himself Haji JAWARA may also be known as Mohamed JAWARA. It was believed that he was using a false identity and that he was originally from The Gambia but claimed to be from Sierra Leone in order to obtain immigration status.

Jawara contends that Agent Smalley's failure to include the source of the information in this recitation negates the affidavit's facial showing of probable cause.

"A search warrant, to be valid, must be supported by an

---

[10]We note that Jawara does not raise a cumulative error claim. *See United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) ("We 'will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.' ") (quoting *Miller v. Fairchild Industries, Inc.,* 797 F.2d 727, 738 (9th Cir. 1986)).

affidavit establishing probable cause." *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985). In *Stanert*, we applied the rationale of *Franks v. Delaware*, 438 U.S. 154 (1978), to hold that a defendant could challenge a facially valid affidavit by making a substantial preliminary showing that "the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Stanert*, 762 F.2d at 781 ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning."). In addition, the defendant must show that the "affidavit, once corrected and supplemented," would not "provide . . . a substantial basis for concluding that probable cause existed" to search defendant's residence. *Id.* at 782. Jawara fails, in several respects, to make this showing.

Jawara fails to show how the alleged omission was "material"—i.e., how it caused technically true statements in the affidavit to be misleading. The first sentence of the disputed paragraph—"I began working on this case after determining that an individual calling himself Haji JAWARA may also be known as Mohamed JAWARA"—indicates that Agent Smalley is the source of the information in this paragraph. Although the second sentence—"It was believed that he was using a false identity . . ." —does not indicate a specific source, it is unclear how this omission is material when read in the context of the first sentence and the dozen paragraphs following it, which describe in excruciating detail how Agent Smalley discovered that "Mohamed" and "Haji" were the same person based on his comparison of photographs, driver licenses, and other documents, and his discovery of contradictory immigration documents submitted under both names.

**[14]** Jawara also fails to make any showing, let alone "a substantial showing" that this omission of source was "deliberate or reckless." *Id.* at 781. In his briefs, Jawara offers only

the observation that "[o]ne cannot determine whether that omission was deliberate or reckless." Nor does Jawara demonstrate that the affidavit, when supplemented with the omitted information, would be insufficient to support a probable cause finding. *Id.* at 782. Thus, the district court did not err in denying Jawara's suppression motion.

## B. *DAUBERT* HEARING

The district court denied Jawara's request for a pre-trial *Daubert* hearing to determine the reliability of Bayer-Broring's expert testimony. District courts have a general "gatekeeping" duty to ensure that proffered expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. This obligation does not, however, require the court to hold a separate *Daubert* hearing. *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere . . . does the Supreme Court mandate the form that the inquiry into reliability and relevance must take . . . .").

**[15]** The district court admitted Bayer-Broring's testimony after reviewing briefs and other materials relating to the *in limine* motion and hearing lengthy oral argument from both counsel. Bayer-Broring's qualifications included a master's degree in Forensic Science, a certification in forensic document examination, and experience in over 700 document examinations, including 50-60 examinations of documents allegedly from Sierra Leone. The district court stated only: "The testimony will be allowed, and the Court finds that a *Daubert* hearing is unnecessary." Although the district court's ruling suggests an implicit finding of reliability, the failure to make an explicit reliability finding was error. *Mukhtar v. California State University*, 299 F.3d 1053, 1066 (9th Cir. 2002) ("[T]he only indication we have that the district court found [the expert's] testimony reliable is the fact that it was admitted . . . . Surely *Daubert* and its progeny require more."). Nonetheless, in light of Bayer-Boring's extensive academic qualifications and experience and the relevance and value of

her testimony to the jury, the "proffered testimony otherwise satisfie[d] the requirements for admission." *United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir. 1993). The lack of an explicit finding of reliability was harmless. *See United States v. Figueroa-Lopez* 125 F.3d 1241, 1247 (9th Cir. 1997) ("Given this background, we are certain [the expert] was qualified to deliver the opinion testimony disputed in this case, and the failure formally to go through the usual process—although an error—was clearly harmless.").

## C.   OTHER EVIDENTIARY CHALLENGES

### 1.   Agent Smalley's Testimony

Agent Smalley testified about the comparative country conditions in Sierra Leone and The Gambia and the location of the Maraka tribe in The Gambia, testimony Jawara challenges as inadmissible hearsay and a violation of his Sixth Amendment right to confrontation. In addition, Jawara challenges the relevance of Agent Smalley's testimony regarding the relative number of asylum applications from natives of Sierra Leone and The Gambia. We review the evidentiary claims for abuse of discretion, *Rahm*, 993 F.2d at 1410, and the constitutional claim for plain error because Jawara failed to object on Confrontation Clause grounds. *See United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005).

In his briefs, Jawara appears to concede that Agent Smalley was a qualified expert witness on immigration and asylum matters. Although Jawara raised a general Confrontation Clause issue in his briefs to this court, it was not until the Petition for Rehearing that Jawara, along with amicus curiae, the National Association of Criminal Defense Lawyers, first addressed whether the expert's reliance on the country report is testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004). This is a significant question given the traditional reliance on State Department country reports in immigration proceedings. We do not need to reach this issue, however,

because the comparative country conditions were not central to the charges here and the admission of this testimony was harmless. *Rahm*, 993 F.2d at 1415. The same is true with respect to Agent Smalley's testimony regarding the computer indices and the location of the Maraka tribe.

**[16]** Similarly, although we doubt the relevance of Agent Smalley's testimony regarding the relative number of asylum applications filed by natives of Sierra Leone and The Gambia, the admission of that testimony was harmless. "[I]t is more probable than not that the error did not materially affect the verdict." *Rahm*, 993 F.2d at 1415.

## 2. Gambian School Examination Records

The district court admitted into evidence two Gambian school examination records, Exhibits 16.2 and 16.3. The government contends that these documents were properly admitted as foreign business records. *See* 18 U.S.C. § 3505. Jawara argues that § 3505 does not support the admission of these documents, and that they should have been excluded on hearsay and authenticity grounds.

"Pursuant to § 3505, '[i]n a criminal proceeding . . . , a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests' " to the requirements set forth in § 3505(a)(1)(A)-(D).[11] *United States v. Hagege*, 437 F.3d

---

[11]Section 3505(a)(1) requires the foreign certification to attest that:

> (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters; (B) such record was kept in the course of a regularly conducted business activity; (C) the business activity made such a record as a regular practice; and (D) if such record is not the original, such record is a duplicate of the original; unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

18 U.S.C. § 3505(a)(1).

943, 956 (9th Cir. 2006) (quoting 18 U.S.C. § 3505(a)(1)). A foreign certification under this section also "serves to authenticate the foreign records, and thus 'dispenses with the necessity of calling a live witness to establish authenticity.' " *Id.* at 957 (quoting *United States v. Sturman*, 951 F.2d 1466, 1489 (6th Cir. 1991)). Congress enacted § 3505 not "to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records." *United States v. Strickland*, 935 F.2d 822, 831 (7th Cir. 1991). "Further, § 3505 did not change the benchmark question in this and every situation involving the admission of documentary evidence: do the documents bear the indicia of reliability?" *Id.* The district court did not abuse its discretion in admitting Exhibits 16.2 and 16.3.

Exhibit 16.2 is a "Statement of Examination Result" for "Candidate Name: Muhammed Jawara" from the West African Examinations Council. The document contains a stamp imprint from the "West African Examinations Council" and reads, in relevant part:

> This is to certify that according to records in this Office MUHAMMED JAWARA took The West African Senior School Certificate Examination in May/June 1998 at the St. Augustine's Senior Secondary School as candidate No. 8010002152.

That statement, along with "details of [Jawara's] [exam] performance" in several subjects, are incorporated into a letter from the Council dated "17th February 2005." The letter, in turn, is attached to an attestation by Abraham Jouf, the head of the Test Development Department.

[17] Jawara argues that this attestation failed to meet the requirements of § 3505(a)(1)(A)-(D). Although Jouf's attestation does not mirror the exact language of § 3505(a)(1), it satisfies the statutory requirements in substance—the certification confirms the accuracy of the test records main-

tained in the files of the examination agency. Because the disputed document contains sufficient indicia of reliability, the district court was within its discretion to admit the document. We also note that the information contained in this exhibit is, in any case, duplicative of Exhibit 16.3, which falls squarely within the purview of § 3505.

Exhibit 16.3 lists "May/June 1998" examination results for students from "St. Augustine's Senior Secondary School" in Banjul, The Gambia, including "Jawara Muhammed." It contains the heading "The West African Examinations Council" and has a stamp imprint from the "Principal" of St. Augustine's. This document is accompanied by a "Certificate of Authenticity of Business Records," signed on January 14, 2005 by Charles Mendy, who attested on penalty of perjury that he is the principal of St. Augustine's. Mendy's attestation contains language exactly mirroring § 3505(a)(1)(A)-(D).

Notably, at the *in limine* hearing, Jawara's attorney initially acknowledged that the exhibit satisfied the statutory requirements: "[E]xhibit 16.3 . . . this is one exhibit from St. Augustine's which does seem to be covered by the certification. The certification certainly tracks the language of the statute . . . ." Jawara later claimed that § 3505 does not support the admission of Exhibit 16.3 because the principal of St. Augustine's cannot attest to an examination record prepared by the West African Examinations Council. This argument is without merit.

**[18]** Section 3505 provides for a "foreign certification" by "the *custodian* of a foreign record of regularly conducted activity or *another qualified person*." 18 U.S.C. § 3505(c)(2) (emphasis added). As the school's principal, Mendy was a proper "custodian" of official examination records for students attending his school. *See United States v. Basey*, 613 F.2d 198, 202 n.1. (9th Cir. 1979) (holding no error in admitting college records where "a sufficient custodian" had attested to the fact that "the records were made and kept in the

regular course of college business," and it was "unimportant under Fed. R. Evid. 803(6)[**12**] that the custodian did not herself record the information or know who recorded the information."). Borrowing the district court's analogy, we would have no trouble concluding that a college in the United States was a proper custodian of its students' SAT results, even though the SAT results were actually prepared by another entity.

**AFFIRMED.**

---

REINHARDT, Circuit Judge, dissenting from the judgment:

I join much of the majority opinion, but disagree that the misjoinder of the indictment is harmless error. I would hold that erroneously joining the two counts — falsifying one's own immigration documents, and conspiring over a substantial period of time to aid other persons to enter into fraudulent marriages in violation of the immigration laws — had a "substantial and injurious effect" upon the jury's determination. *United States v. Lane*, 474 U.S. 438, 449 (1986).

Although the majority characterizes the evidence of guilt under both counts as "overwhelming," Maj. at 828, the evidence with respect to the falsification of the defendant's own immigration documents is clearly not. Jawara never denied that there were material errors in his asylum application. To the contrary, he acknowledged the errors in the application, but testified that he was not aware of their existence because another individual prepared the document for him. He also testified that he was unaware of any problems regarding the supporting documents and that he had received the identifica-

---

**12**See *United States v. Klinzing*, 315 F.3d 803, 810 (7th Cir. 2003) (explaining that "the foreign business records exception, § 3505, derived specifically from . . . [Fed. R. Evid.] 803(6).").

tion card from a government office and his birth certificate from his brother in Sierra Leone. The crucial issue with respect to the document fraud charge, thus, was Jawara's credibility. Although the government presented an expert witness whose testimony rendered some of Jawara's testimony implausible, if the jury nevertheless believed his explanations it would have acquitted him on that charge.

In the vast majority of cases, and especially in cases in which a defendant's credibility is the crucial issue, the most prejudicial evidence the prosecution can present — perhaps aside from a confession — is testimony establishing that the defendant has committed other serious crimes and is a bad person generally. Evidence of other crimes is particularly damning when the other crimes, as in this case, are of the same general type (here, immigration offenses) as the offense with which the defendant is charged. Here, it is plain not only that Jawara's credibility was undermined, but that his entire defense to the document fraud charge was destroyed when the prosecution was allowed not only to inform, but to persuade, the jury that following his own immigration violations Jawara engaged in a course of criminal conduct in violation of the immigration laws — that he engaged in a continuous pattern of immigration fraud in aiding others to arrange fraudulent marriages to circumvent the immigration statutes. Once the jury reached its conclusion that Jawara had committed the serious criminal offense of conspiring over an extended period of time to aid *others* to fraudulently violate the immigration laws, so that they would become eligible to remain in the United States, it was almost inevitable that it would believe that Jawara violated the immigration laws with respect to his own immigration papers so that he would be able to remain here. The case with respect to Jawara's unlawful aid to others having been proven, it is unreasonable to expect that the jury would consider the question of Jawara's falsification of his own documents solely on the evidence relative to that count. Persuading the jury of Jawara's guilt on the more serious conspiracy charge eliminated any real possibility that it

would accept his contention that he was unaware of the misrepresentations in his own application and the errors in his other documents.

Prejudice can arise even more readily than in the average case when there is misjoinder of a crime that would be particularly disturbing to the average juror. Conspiring to violate the immigration laws by aiding a number of aliens to remain in the country unlawfully and obtain permanent resident status would be highly offensive to many jurors these days. In *United States v. Terry*, 911 F.2d 272 (9th Cir. 1990), a leading case on misjoinder, we held that the district court erred under Rule 8(a) in joining two drug-related charges with a count of being a felon in possession of a firearm. We concluded that the misjoinder prejudiced the defendant:

> A juror would inevitably be more disturbed about the idea of a "drug dealer" with a gun than a citizen who previously had committed some unknown crime. It is highly probable that this inculpatory characterization of Terry as a drug dealer influenced the jury in determining its verdict.

*Id.* at 277. Similarly, here, the jury likely was influenced, in determining whether Jawara was guilty of submitting his own fraudulent immigration document, by its conclusion that he had in fact conspired to commit immigration fraud to aid others over an extended period of time.

Furthermore, a "substantial disparity" in the strength of the evidence of two separate offenses which are joined can "taint[ ] the jury's consideration" of the offense for which there is weaker evidence. *Bean v. Calderon*, 163 F.3d 1073, 1085 (9th Cir. 1998) (citing *Lucero v. Kerby*, 133 F.3d 1299, 1315 (10th Cir. 1998)). By hearing far stronger evidence on the conspiracy charge than the document fraud charge, the jury may have experienced " 'the human tendency to draw a conclusion which is impermissible in the law: because he did

it before, he must have done it again.' " *Id.* (quoting *United States v. Bagley*, 772 F.2d 482, 488 (9th Cir. 1985)).

Although the majority relies heavily on its technical arguments that the district court's error was mitigated by the instruction that the jury consider the counts separately, Maj. at 828, and that the jury could compartmentalize the evidence as to each charge, these factors, while not irrelevant, are hardly sufficient to overcome the overwhelming actual prejudice created in this case by joinder with the conspiracy charge.

For these reasons, I would find the improper joinder prejudicial, at least with respect to the document fraud charge. Accordingly, I dissent from the majority's holding that there was no prejudice in this case.

Because I would reverse on misjoinder, I need not consider whether the Confrontation Clause also requires reversal, under *Crawford v. Washington*, 541 U.S. 36 (2004). However, as I have stated, the evidence on the document fraud charge is comparatively weak. Thus, I do not agree with the majority's determination of harmless error with respect to the expert testimony regarding the State Department country reports.